E-FILED
Monday, 23 November, 2020  10:29:26 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| KIMBERLEE L. DENNIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19-cv-3242 |
| | ) | |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>REPORT AND RECOMMENDATION</u>

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Kimberlee L. Dennis appeals from the denial of her application for Social Security Disabled Widow's Benefits under Title II and Supplemental Security Income under Title XVI of the Social Security Act (collectively Disability Benefits).  42 U.S.C. §§ 402(e), 416(i), 423, 1381a and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Dennis filed a Brief in Support of Motion for Summary Judgment (d/e 11) (Dennis Brief).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 15).  Plaintiff then filed Plaintiff's Reply Brief to Defendant's Motion for Summary Judgment (d/e 16).  This matter is before this Court for a Report and Recommendation.  For the reasons set forth

below, this Court recommends that the Decision of the Commissioner should be AFFIRMED.

## STATEMENT OF FACTS

### Background

Dennis was born on August 6, 1964, and completed high school attending many special education or remedial classes.  She previously worked in nursing homes as a dietary aide and, briefly, as a laundry worker.  She also delivered newspapers part-time.  She was an unmarried widow at the time of her application and alleged she became disabled on March 8, 2014 (Onset Date).  Dennis suffers from urinary incontinence, obesity, major depressive disorder, and bipolar disorder.  Certified Transcript of Proceedings Before the Social Security Administration (d/e 8) (R.), 15-16, 23-24, 235-38, 258.

### Evidence Prior to the Evidentiary Hearing

On October 29, 2014, Dennis saw Physician's Assistant Kristina Samson, PA-C, to establish care.  R. 347-52.  Dennis' medical history included diagnoses of diabetes and depression.  She reported that her depression medicine of Wellbutrin and Zoloft worked well, and she had no depression symptoms or thoughts of hurting herself or others.  R. 347.  On examination, Dennis was 5 feet 3 inches tall, weighed 223 pounds, and had

a body mass index (BMI) of 39.51.  Her mood and affect were normal.  R. 349.  Samson assessed that Dennis' depression was stable and continued her medications.  R. 350.

On January 12, 2015, Dennis saw psychiatrist Dr. Philip Woerner, M.D.  R. 399.  Dennis reported that she had "anger problems" that had worsened over the last year and a half.  She had hallucinations of her deceased husband for a while after his death.  Dr. Woerner's mental stats examination showed that Dennis' responses were relevant and coherent.  R. 400.  Dr. Woerner assessed major depressive disorder with agitation and an affective disorder.[1]  Dr. Woerner discontinued the Wellbutrin and Zoloft prescriptions and started Dennis on fluoxetine and Latuda.  R. 399.

On February 23, 2015, Dennis saw Dr. Woerner.  Her boyfriend went with her as he often accompanied Dennis at her medical appointments.  Dennis reported feeling better after the change in her medication and her boyfriend agreed with her.  Dr. Woerner assessed major depressive disorder, chronic and continued her medications.  R. 401.

On March 23, 2015, Dennis saw Samson for bladder incontinence.  R. 362-66.  Dennis had treated the condition successfully with Detrol, but her insurance would not pay for the medication anymore. She had leakage

---

[1] The handwritten note describing the type of affective disorder in not legible.

with coughing, sneezing, and laughing and often felt urgency to urinate but was unable to get to the bathroom in time.  She soaked through pads and her boyfriend said she smelled of urine.  R. 363.  On examination, Dennis' mood and affect were normal.  Samson assessed urinary incontinence, and prescribed Ditropan XL (oxybutynin), and recommended exercises.  R. 365.

On March 31, 2015, Dennis saw Samson again.  R. 367-71.  She reported her urinary incontinence was much improved with only a small amount of leakage in the morning.  R. 368.  On examination, Dennis was 5 feet 2 inches, weighed 222 pounds, and had a body mass index (BMI) of 40.59.  R. 367.  Dennis had normal affect and mood.  R. 370.  Samson continued the medication and told Dennis to continue the exercises and report if incontinence did not resolve itself.  R. 370.

On July 16, 2015, Dennis saw Samson.  R. 376-80.  Her urinary incontinence symptoms had returned and were worse.  She also reported bowel incontinence and had loose stools without any warning.  R. 376-77. On examination, Dennis' abdomen was normal, and her mood and affect were normal.  Samson increased the dosage of the Ditropan and referred Dennis to a specialist in gynecology/urology.  R. 378-79.

On September 17, 2015, Dennis saw gynecologist Dr. M. Elaina Oatey, D.O.  R. 419-20.  Her urinary incontinence was "100 percent better

during the day but only about half better at night."  R. 419.  Dr. Oatey increased the dosage of the oxybutynin.  R. 419.

On October 15, 2015, Dennis saw Dr. Oatey and reported that she was 50 percent better.  Dr. Oatey advised Dennis to decrease intake of liquids after 6:00 p.m. and to cut back on caffeine.  Dennis said she drank a lot of soda and Dr. Oatey said the soda irritated her bladder.  She told Dennis to decrease her intake.  R. 417.

On June 22, 2016, Dennis saw Nurse Practitioner Jill Miller, N.P.  R. 501-04.  She reported that she was doing well.  She had occasional urge incontinence, but her medication "does help some."  R. 501.  On examination, Dennis weighed 231 pounds and had a BMI 42.94.  R. 504. She was oriented, her mood and affect were normal, her insight and judgment were intact, and her recent memory was not impaired.  R. 503. Miller continued her medications.  R. 501.

On July 19, 2016, Dennis completed a Function Report – Adult form. R. 272-79 (Function Report).  She lived in an apartment with her boyfriend. R. 272.  On a typical day, she cleaned the apartment and did laundry.  R. 273.  She made sandwiches for lunch and cooked dinner which took about an hour.  R. 274.  She cared for her granddaughter, changing her diapers and cooking her meals.  She fed her pets and let them go outside.  She did

not sleep well.  She dressed herself and took care of her personal needs; however, she did not always make it to the bathroom on time.  R. 273.  She needed reminders to bathe and to take her medications.  R. 274.

Dennis went outside regularly.  She walked and rode in cars.  She went out alone, and she could drive.  She did the grocery shopping and paid bills, but had difficulty counting change.  R. 275.  She listed watching television as her hobby or interest, but she said that she was "not good at all" at it.  She said, "I don't think well anymore."  She said that she did not go anywhere for social activities and did not get along with her family.  R. 276-77.

Dennis said that her impairments affected her ability to walk, talk, remember, complete tasks, understand, follow instructions, use her hands, and get along with others. R. 277.  She became moody and anxious around people and then experienced panic attacks, became angry, and would "tell people off."  R. 273.  She had difficulty following instructions, whether written or spoken.  She also had trouble understanding and remembering instructions and was laid off because "I told my boss off." She could not handle changes in routine.  R. 277-78.

On August 19, 2016, Dennis saw state agency psychologist Dr. Frank Froman, Ed.D., for a consultative mental status examination.  R. 427-30.

Dennis said she was a widow with two grown children and lived with her boyfriend. She graduated high school in a "slow learner program." She reported problems with her bowels. She said, "'I can't hold it – I have to go three or four times a day.'" R. 427. She currently worked delivering newspapers. She had a driver's license but did not like to drive. She babysat her grandchild and cared for her dog. She slept six hours at night and did not take naps. R. 428.

Dennis' speech was "clear, simplistic, and easy to track." She made good eye contact and was oriented and in good contact with reality. Dr. Froman estimated Dennis' IQ to be in the mid 70's. R. 428. Dr. Froman assessed major depressive disorder with episodic agitation; borderline intellectual functioning and borderline personality traits. Dr. Froman concluded:

> **CONCLUSIONS:** Kimberlee appears able to perform one and two step assemblies. It is unlikely that she is able to function competitively, with a general tendency to be slow. She is able to relate modestly to co-workers and supervisors, and can do so as long as they do not offend her. She is able to understand oral and written instructions and can manage benefits. As to whether she could withstand the stress associated with customary employment, she appears to do reasonably well in a fairly isolated, self- directed setting such as "delivering papers" she may have greater difficulty in a supervisory setting where she is told what to do by others.

R. 429.

On August 29, 2016, Dennis saw Dr. Woerner.  She reported that she was irritable since Dr. Woerner increased the dosage of her Latuda.  She talked about going back to work "which was quite a change" and she was pleasant during the session.  Dr. Woerner assessed major depressive disorder, chronic and continued her medications.  R. 432.

On August 31, 2016, state agency psychologist Dr. Leslie Fyans, Ph.D., prepared a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment of Dennis.  R. 89, 91-92.  Dr. Fyans opined that Dennis had an organic mental disorder, affective disorder, and personality disorder.  Dr. Fyans found that these mental impairments caused mild restrictions on activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace.  Dr. Fyans found that Dennis had one or two episodes of decompensation.  R. 89. Dr. Fyans noted that Dennis' mental status examination was within normal limits and opined that Dr. Froman underestimated Dennis' adaptive functioning.  R. 89.  Dr. Fyans found that Dennis was moderately limited in her ability to understand, remember, and carry out detailed instructions; moderately limited in her ability to maintain attention and concentration for extended periods; and

moderately limited in her ability to respond appropriately to instructions and criticism from supervisors.  R. 91-92.

Dr. Fyans concluded that Dennis' "cognitive and attentional skills for simple one and two step tasks are intact."  Dr. Fyans further found,

> The client can sustain this across a work day and a work week. The [activities of daily living] indicate client is capable of carrying out routine chores and tasks. The clients (sic) mental status is within normative limits hence the clients (sic) allegations are only partially consistent with objective medical evidence. Client has the ability to relate and communicate with others and tolerate work pressures. The clients adaptive and interpersonal and cognitive resources are capable of doing one and two step unskilled tasks.

R. 92.

On October 20, 2016, Dennis saw Nurse Practitioner Miller.  On examination, Miller observed that Dennis was oriented, her mood and affect were normal, her judgment and insight were intact, and her recent and remote memory were not impaired.  She denied any suicidal or homicidal ideations.  Dennis' boyfriend reported that Dennis had suicidal thoughts and auditory hallucinations, but Dennis "is currently denying these today."  Miller stated that Dennis did not exhibit any delusions or hallucinations.  R. 444.

On November 10, 2016, Dennis saw Nurse Practitioner Miller.  R. 437-39.  Miller had increased the dosage of her oxybutynin at the last visit

and the medication was helping.  R. 437.  On examination, Dennis was oriented, and her mood and affect were normal.  R. 439.

On November 28, 2016, state agency psychologist Dr. Joseph Mehr, Ph.D., prepared a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment.  R. 104-05, 108-10.  Dr. Mehr agreed with Dr. Fyans' opinions.  Dr. Mehr opined that Dennis had an organic mental disorder, affective disorder, and personality disorder.  He opined that Dennis' mental impairments mildly restricted her ability to engage in activities of daily living and her ability to maintain social functioning; and moderately restricted her ability to maintain concentration, persistence or pace.  Dr. Mehr said that Dennis had one or two episodes of decompensation and noted that Dennis' mental status examination was within normal limits.  He opined that Dr. Froman underestimated Dennis' adaptive functioning.  R. 105.  Dr. Mehr said that Dennis was moderately limited in her ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and respond appropriately to instructions and criticism from superiors.  R. 108-09.  Dr. Mehr repeated Dr. Fyans' conclusion quoted above.  R. 110.

On January 26, 2017, Dennis saw Nurse Practitioner Miller.  She had a continued issue with incontinence despite the oxybutynin.  She said,

however, that she did not have frequent urination, feelings of urgency, or dysuria.  R. 484.  Miller urged Dennis to drink more water.  Dennis reported that she drank primarily diet soda.  Miller planned to refer Dennis to a urologist.  Dennis was oriented, her mood and affect were normal, her insight and judgment was intact, and her recent and remote memory were not impaired.  R. 485.

On February 13, 2017, Dennis saw Dr. Woerner.  She was feeling well and was considering returning to work, but was having trouble staying sleeping.  She was waking up and having trouble getting back to sleep.  Dr. Woerner assessed major depressive disorder, chronic.  He recommended melatonin for her sleep and continued her fluoxetine, Wellbutrin, and Latuda prescriptions.  R. 830.

On April 4, 2017, Dennis saw urologist Dr. Austin DeRosa, M.D.  R. 481-83.  Dennis said that her incontinence symptoms were worse.  She said she drank a cup of coffee each day and several Mountain Dew sodas each day.  Dr. DeRosa recommended continuing her medications, engaging in time voiding, and starting pelvic floor muscle therapy.  He also recommended diet, exercise, and weight loss.  R. 481.  On examination, Dennis was 5 feet 1.5 inches tall, weighed 250 pounds 4 ounces, and had a BMI of 46.52.  R. 483.

On April 25, 2017, state agency psychologist Dr. Froman conducted a second consultative mental status examination, which this time included a formal IQ assessment.  R. 456-63.  Dennis' full-scale IQ was 70, which was in the borderline range.  R. 460.  Dr. Froman's mental status examination was essentially unchanged from the August 19, 2016 examination.  Dr. Froman assessed major depressive disorder with episodic agitation, borderline intellectual functioning by assessment, and borderline personality traits.  Dr. Froman concluded:

> **CONCLUSIONS:** Kimberlee appears able to perform one and two step assemblies.   It is unlikely that she can function competitively, with a general tendency to be slow.  She can relate modestly to co-workers and supervisors, and can do so if they do not offend her.  She can understand oral instructions and can manage benefits.  As to whether she could withstand the stress associated with customary employment, she appears to do reasonably well in a fairly isolated, self-directed setting such as "delivering papers" she may have greater difficulty in a supervisory setting where she is told what to do by others.

R. 463.

The same day, April 25, 2017, Dr. Froman completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) form (Medical Source Statement).   R. 451-53.  Dr. Froman opined that Dennis' mental impairments mildly restricted her ability to remember and carry out simple instructions, moderately restricted her ability to make judgments on simple work-related decisions, and extremely restricted her ability to

remember and carry out complex instructions and make judgments on complex work-related decisions. Dr. Froman listed Dennis' low cognitive ability as the basis for these opinions. R. 451. Dr. Froman opined that Dennis was moderately limited in her ability to interact appropriately with the general public, supervisors, and co-workers, and markedly limited in her ability to respond appropriately to usual work situations and changes in routine. Froman listed immature attention-seeking behavior as the basis for these opinions. R. 452. Dr. Froman opined that Dennis' mental impairments did not otherwise affect her ability to engage in work-related activities. R. 452.

On August 27, 2017, Dennis saw Dr. Woerner. She was doing well in the morning but was irritable in the afternoon. Dr. Woerner assessed major depressive disorder, chronic. He discontinued Dennis' fluoxetine and started her on Venlafaxine and continued her Wellbutrin and Latuda prescriptions. R. 832.

On November 27, 2017, Dennis saw Dr. Woerner. She felt much better after the medication change and was considering going back to work. She said the nursing home would like her back. Dr. Woerner assessed major depressive disorder, chronic. He continued her medications. R. 833.

On January 16, 2018, Dennis saw Dr. Craig R. Davenport, M.D., for a check of her diabetes.  R. 680-84.  Dennis reported that she had given up drinking soda and was working on a better diet. On examination, she weighed 248 pounds and had a BMI of 45.73.  R. 679.

On February 26, 2018, Dennis saw Dr. Woerner.  She was doing fairly well and was sleeping well.  Dr. Woerner assessed major depressive disorder, chronic and continued her medications.  R. 834.

<u>The Evidentiary Hearing</u>

On August 22, 2018 an Administrative Law Judge (ALJ) conducted an evidentiary hearing in this case.  R. 31-72.  Dennis appeared with her attorney by videoconference.  Vocational expert Julie Svec appeared by telephone.  R. 33.

Dennis testified first.  She worked for four years as a dietician in a nursing home.  She prepared thickened drinks for patients, made sure patients received their snacks, and performed other duties as assigned.  She prepared the drinks from written recipes and memorized the recipe of one thickened drink.  She remembered which patient received which drink and which patient received which type of snack.  The type of snack varied with each patient's dietary restrictions.  R. 36-37.  She also took lunch orders from patients which the patients chose from a posted menu.  She

wrote down the orders and gave the orders to certified nurse's assistants (CNAs) who delivered the lunches to the patients.  R. 37-38.  Dennis also pushed patients in wheelchairs to the dining room.  R. 39.  She said that her supervisor fired her because she did not get along with the supervisor and some of her co-workers.  R. 39.

After she was fired, Dennis worked briefly at another nursing home. She filled out a written application for the job by herself and got an interview and was hired at the interview.  She worked in the laundry, but the job did not last long.  She said lifting clothes and other laundry was hard on her hips and back.  R. 40-41.

From 2016 to 2018, Dennis delivered newspapers.  She was paid $100 every two weeks and she worked alone.  The papers were delivered to her home early in the morning.  She rolled the papers, put them in plastic bags, and delivered them to a list of addresses provided to her.  R. 70-71.

Dennis had a cell phone, and she sent and received text messages. She did not use her phone to go on the Internet and she did not know how to use a computer.  R. 41-42.

Dennis lived alone since August 1, 2018.  She lived in an apartment and did not climb any stairs to get to her apartment.  R. 46.  Before August 1, 2018, she lived with her former boyfriend.  They had been together for

10 years.  R. 43-44.[2]  Dennis had two adult children and nine

grandchildren.  She did not help care for any of her grandchildren.  A

daughter and granddaughter lived near Dennis.  Dennis did not help care

for that granddaughter because her daughter's aunt babysat that

granddaughter. R. 42-43.

Dennis owned a car and had a driver's license.  The longest trips she

took since March of 2014 was the 35-minute drive from her home to

Quincy, Illinois.  She drove a friend to the doctor once a month.  R.44.

Someone else drove Dennis to the hearing because she did not know

where the place for the hearing was.  R. 57.  She did not like to drive, and

she did not drive long distances.  R. 57.

Dennis said that she had to go to the bathroom three to four times a

day because of urinary incontinence.  In addition, she had to go to the

bathroom because of fecal incontinence three to four times a week.  She

spent about 25 minutes in the bathroom when she had fecal incontinence.

R. 50-51.  Dennis had accidents due to incontinence and once or twice a

week, she had to change clothes because of her accidents.  She had

additional incidents of urinary leakage that were not severe enough to

---

[2] Dennis explained that some of her healthcare providers referred to her former boyfriend as her husband. R. 43.

require changing clothes.  R. 51.  She had "giggle leaks or stress leaks" once or twice a week and wore Depend undergarments when she left the house and when she slept.  Once or twice a week, her nighttime leakage required changing sheets.  R. 52.

Dennis also discussed her mental impairments.  She had crying spells one to four times a week and had feelings of hopelessness and worthlessness, and thoughts of suicide.  She had suicidal thoughts once or twice a week but had not made any plans.  R. 53-54.

Dennis became anxious in crowds and her anxiety caused panic attacks.  She experienced chest pain like she was having a heart attack.  When she experienced a panic attack, she got away from the crowd and calmed down.  She had panic attacks about once or twice a week and each lasted for 15 minutes.  R. 54-55.

Dennis also had manic episodes once or twice a week.  During these episodes she wanted to be left alone and she became violent.  She would hit family and friends.  R. 55-56.  She had depressive episodes one to four times a week and wanted to be left alone during these episodes also.  R. 56.

Dennis had to be reminded to shower.  Her daughter reminded her and she said she listened to her daughter sometimes.  She did not style her hair and did not care what her hair looked like. R. 60.

Dennis had difficulty falling asleep with thoughts running through her head that kept her awake.  She woke up during the night one to four times a week, but did not know why she woke up.  When that happened, she watched a movie and typically went back to sleep.  About once a week, she could not go back to sleep.  R. 60-61.  She did not take naps during the day; however, about once a week she fell asleep unexpectedly during the day. R. 62.

Dennis could sit for an hour before changing positions, stand for 20 minutes  before she needed to sit, and lift 15 pounds.  Before the hearing, she attempted to lift a 10-pound weight at her attorney's office, but she could not lift the weight at that time.  Dennis said that kneeling hurt her knees and that she could not squat or crawl for work.  R. 62-63.

At one point, the ALJ asked Dennis why she could not work.  Dennis said, "I can't stand very long on my hip or my legs.  They start hurting." Dennis said that there was no other reason.  R. 45.

Vocational expert Svec then testified.  Dennis stipulated to Svec's qualifications to testify as a vocational expert.  R. 64.  Svec classified Dennis' prior job as a dietary aide. The job was at the medium exertional level.  R. 64.  The ALJ asked Svec the following hypothetical question:

> Q   All right. I would ask you to assume a hypothetical individual of the claimant's age, education, and work history.  . . . [A]ssume that the individual is capable of work at a medium exertional level, but can never climb ladders, ropes or scaffolds, or be exposed to unprotected heights or hazardous work environments; may . . . [f]requently climb stairs or ramps, and frequently stoop, crouch, kneel or crawl.  The individual would be limited to remembering and carrying out simple, routine tasks and making simple, work-related decisions. They could not perform production-paced tasks with strict hourly goals. They could have frequent contact with supervisors, but occasional contact with co-workers and the general public. They would need to avoid concentrated exposure to dust, fumes, chemicals, and other pulmonary irritants, as well as extreme heat. And finally, would be off task five percent of the workday. . . .
> . . . .
> Q  Can the hypothetical individual perform the past work of the claimant?

R. 64-65.  Svec said that the person could not do Dennis' prior work.  Svec said that such a person could perform other jobs in the national economy. Svec listed as examples, jobs including  warehouse worker, with 221,000 such jobs in the national economy; kitchen helper, with 217,000 such jobs in the national economy; and laundry worker with 210,000 such jobs in the

national economy.  R. 65-66.  Svec said the person could not work if she
would be off-task 15 percent of the time.  R. 67.

## THE DECISION OF THE ALJ

On October 29, 2018, the ALJ issued her decision.  R. 13-25.  The
ALJ followed the five-step analysis in the Social Security Administration
Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires
that the claimant not be currently engaged in substantial gainful activity.  20
C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to
have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true,
Step 3 requires a determination of whether the claimant is so severely
impaired that she is disabled regardless of her age, education and work
experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this
requirement at Step 3, the claimant's condition must meet or be equal to
the criteria of one of the impairments specified in 20 C.F.R. Part 404
Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If
the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the
Analysis.

Step 4 requires the claimant not to be able to return to her prior work
considering her age, education, work experience, and Residual Functional
Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If

the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step to present evidence that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Dennis met her burden at Steps 1 and 2.  She had not engaged in substantial gainful activity since the Onset Date.  Her paper route was part-time and not substantial gainful activity.  She had the severe impairments of urinary incontinence, obesity, major depressive disorder and bipolar disorder.  R. 15.

At Step 3, the ALJ found that Dennis' impairments or combination of impairments did not meet or equal a Listing.  The ALJ considered Listings 12.04 for depressive bipolar and related disorders such as depression, and 12.06 for anxiety and obsessive-compulsive disorders.  The ALJ explained that paragraph B of these Listings required evaluating Dennis' functional

limitations in four broad categories:  understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing themselves (Paragraph B Areas).  Dennis' impairments could meet or equal either Listing if she had a marked limitation in two categories or an extreme limitation in one category. A marked limitation meant that the person's functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.  An extreme limitation meant that the person is unable to function at all in this area independently, appropriately or effectively, and on a sustained basis.  R. 16-17; see Listing 12.00(F).

The ALJ found that Dennis was mildly limited in understanding, remembering, or applying information.  The ALJ relied on Dennis' Function Report in which she said she prepared meals, paid bills, and used a checkbook.  The ALJ also cited medical records that showed she could follow treatment regimens and also contained largely normal mental status examinations.   The ALJ stated that Dennis had some limits on her ability to understand, remember, or apply information, but the limitations were no more than moderate.  R. 17.

The ALJ found that Dennis was moderately limited in concentrating, persisting, or maintaining pace.  The ALJ stated that Dennis reported in the

Function Report that she watched television and drove.  The ALJ also

stated that the medical records showed she could perform simple

calculations, stay on task during examinations, and converse with the

examiner. R. 17

The ALJ found that Dennis was mildly limited in the area of adapting

or managing oneself.  The ALJ cited the Function Report in which Dennis

reported that she took care of her granddaughter, prepared meals, did

laundry, took care of herself, shopped for groceries, and took care of her

own financial affairs.  The ALJ also cited normal mental status

examinations in the medical records.  R. 17.[3]

At Step 4, the ALJ found that Dennis had the following RFC:

6.    After careful consideration of the entire record, I find that
the claimant has the residual functional capacity to perform
medium work as defined in 20 CFR 404.1567(c) and 416.967(c)
except the claimant can never climb ladders, ropes or scaffolds
or be exposed to unprotected heights or hazardous work
environments; she can frequently climb stairs or ramps, stoop,
crouch, kneel or crawl; the claimant is limited to remembering
and carrying out simple, routine tasks and making simple work-
related decisions; she cannot perform production pace tasks
that require strict hourly goals; the claimant can have frequent
contact with supervisors and occasional contact with co-
workers and the general public; she must avoid concentrated
exposure to dust, fumes, chemicals and other pulmonary

---

[3] The ALJ also found that Dennis' impairments did not meet the alternative paragraph C criteria in these
Listings.  The ALJ found, "The record is devoid of any evidence to suggest that the claimant has become
unable to function outside of her home or a more restrictive setting, without substantial psychosocial
supports."  The ALJ also relied on the fact that no state agency psychologist opined that she met a
Listing. R. 18.  Dennis does not argue that she met paragraph C requirements of these Listings.

irritants, as well as extreme heat; the claimant will be off task
for five percent of an eight-hour workday.

R. 18.

The ALJ stated that the postural limitations addressed Dennis'

incontinence.  The ALJ relied on the fact that Dennis did not follow medical

advice to stop consuming caffeinated drinks such as soda and coffee, until

2018.  The ALJ noted that, thereafter, Dennis' medical records contained

few references to problems with urinary incontinence.  R. 19-20.

The ALJ relied on the opinions of Drs. Fyans and Mehr, and the notes

from her visits with Dr. Woerner that showed some problems that were

addressed by adjustments to her medications.  R. 20.  The ALJ also relied

on records from her visits with other healthcare providers that showed

largely normal mood and affect, intact judgment and insight, and

unimpaired memory.  R. 21-22.

The ALJ did not give weight to Dr. Froman's conclusion that Dennis

was unlikely to be able to function competitively with a general tendency to

be slow.  The ALJ noted that Dennis worked for four years and did not have

any problems being too slow.  The ALJ further noted that Dr. Froman

stated in his examinations that Dennis could understand written and oral

instructions, but then opined in the Medical Source Statement that she was

extremely limited in her ability to understand and carry out complex

instructions.  The ALJ found these findings to be inconsistent, and further, found that Dr. Forman failed to explain the inconsistencies.  R. 23.

The ALJ also  found that Dennis' testimony about her limitations were inconsistent with the other evidence in the record.  The ALJ noted that Dennis stated in the Function Report that she did laundry and dishes, cared for her granddaughter, cared for her pet, prepared daily meals, went out several times a day, went grocery shopping, and took care of her personal financial affairs. She found these statements to be inconsistent with Dennis' testimony about her functional limitations.  R. 22.

Upon determining the RFC, the ALJ found at Step 4 that Dennis could not perform her past relevant work. R. 23.  At Step 5, the ALJ found that Dennis could perform a significant number of jobs in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the testimony of vocational specialist Svec that she could perform the representative jobs of warehouse worker, kitchen helper, and laundry worker.  R. 24.  The ALJ concluded that Dennis was not disabled.

Dennis appealed.  On September 19, 2019, the Appeals Council denied her request for review.  The decision of the ALJ then became the

final decision of the Defendant Commissioner.  R. 1.  Dennis then brought
this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine
whether it is supported by substantial evidence.  Substantial evidence is
"such relevant evidence as a reasonable mind might accept as adequate"
to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).
This Court must accept the findings if they are supported by substantial
evidence and may not substitute its judgment or reweigh the evidence.
Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782
F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation
of statements regarding the intensity, persistence, and limiting effect of
symptoms unless the evaluation is patently wrong and lacks any
explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351,
367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008);
SSR 16-3p, 2017 WL 5180304, *1 (October 25, 2017) (original version at
2016 WL 1119029, at *1 (March 16, 2016)) (The Social Security
Administration no longer uses the term credibility in the evaluation of
statements regarding symptoms).  The ALJ must articulate at least
minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d

329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical

bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863,

872 (7th Cir. 2000).

Dennis raised issues related to the ALJ's consideration of her mental

impairments.  The Court, therefore, focuses its analysis on the issues

raised.  See Schomas v. Colvin, 732 F.3d 702, 707 (7th Cir. 2013) (issues

not raised on appeal are forfeited); Bollas v. Astrue, 694 F.Supp.2d 978,

990 (N.D. Ill. 2010) (same).

The ALJ's determinations that Dennis' mental impairments did not

render her disabled is supported by substantial evidence.  The ALJ cited

substantial evidence to support the conclusion that Dennis did not meet

Listings 12.04 and 12.05 because she did not have a marked limitation in

two of the Paragraph B Areas or an extreme limitation in one Paragraph B

Area.  The ALJ cited specific examples of Dennis' Function Report to

support these findings.  R. 17-18.  The ALJ also gave great weight to the

opinions of state agency psychologists Drs. Fyans and Mehr.  R. 22.  Their

opinions supported the findings regarding these Listings.  R. 89, 91-92,

104-05, 108-10.

Dennis complains that the ALJ mischaracterized Dennis' statement in

the Function Report that she watched television as evidence that she was

only moderately limited in the area of concentrating, persisting or maintaining pace.  R. 17.  Dennis notes that she indicated that she was not good at all at watching television.  R. 276.  Any error in the characterization of Dennis' statement in her Function Report about watching television was harmless.  An error is harmless if the error would not affect the outcome of the case.  See Schomas, 732 F.3d at 707.  Here, the ALJ did not rely only Dennis' ability to watch television.  The ALJ also relied on the evidence that Dennis could perform simple calculations, stay on task during her examinations, and converse with an examiner.  Dr. Froman's examinations all supported these observations.  See R. 428, 457, 463.  Furthermore, Drs. Fyans and Mehr both opined that Dennis was moderately limited in this Paragraph B Area.  The ALJ's reference to watching television, if error, was harmless and did not affect the outcome of the case.

Dennis also complains that the ALJ erred in citing the Function Report to support the finding that Dennis drove.  Dennis argues that she answered the question "How do you travel" on the Function Report by only checking the boxes that indicated she walked and rode in a car.  She did not check the box that indicated she drove.  This argument is unpersuasive because on the same page of the Function Report Dennis answered "yes" to the question, "Do you drive?"  R. 275.  There was no error.  Even if the

ALJ's characterization of Dennis' Function report was somehow erroneous, any error was harmless. Dennis clearly could drive. She testified that she drove a friend to the doctor once a month. That trip took 35 minutes one way. R. 44. Thus, even if Dennis' claim of error on this point had any merit, the error was harmless. See Schomas, 732 F.3d at 707.

Dennis argues that the ALJ erred at Step 3 because her mental impairments met Listing 12.05 for intellectual disorders. The Court disagrees. Dennis met one requirement of Listing 12.05; an IQ test showed she had a full-scale IQ of 70. Listing 12.05(B)(1)(a). To meet Listing 12.05, however, a person must also be markedly limited in two, or extremely limited in one of the same Paragraph B Areas included in Listings 12.04 and 12.06. Listing 12.05(B)(2). The ALJ's findings that Dennis did not have the required marked or extreme limitations in Listings 12.04 and 12.06 would apply equally here and support the ALJ's conclusion that Dennis' impairments or combination of impairments did not meet or equal a Listing.

Dennis cites Dr. Froman's reports to support her argument that Dennis' impairments met Listing 12.05. Dr. Froman did not opine on the Paragraph B Areas. He stated that she could understand oral and written instructions. R. 429, 463. He also opined that Dennis was mildly limited in

understanding, remembering and carrying out simple instructions; and was extremely limited in understanding, and carrying out complex instructions and making judgments on complex work-related decisions. R. 451. He stated that she could "modestly relate to co-workers and supervisors as long as they did not offend her." R. 429. He also opined that she was moderately limited in interacting appropriately with the general public, co-workers, and supervisors; and was markedly limited in responding appropriately to usual work situations and to changes in routine work settings. R. 452. He concluded that she was unlikely to perform customary employment because she was slow. R. 429, 463.

None of Dr. Froman's opinions found that Dennis had a marked or extreme limitation in the four Paragraph B Areas of understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing themselves. Dr. Froman said that Dennis could understand written and oral instructions, had mild difficulty with simple instructions, and extreme difficulty with complex instructions. Those opinions did not indicate that Dennis had an extreme or even marked limitation in the broad general category of understanding, remembering, or applying information.

Similarly, Dr. Froman said that Dennis could modestly get along with supervisors and co-workers if they did not offend her; that she was moderately limited in dealing with the public, supervisors, and co-workers; and markedly limited in responding to usual work situations and changes in routing. Those opinions did not indicate that Dennis had a marked or extreme limitation in interacting with others generally.

In contrast, Drs. Fyans and Mehr directly opined on these issues. Their opinions supported the ALJ's findings. See R. 89, 91-92, 104-05, 108-10. In light of those opinions and the other evidence cited by the ALJ, the ALJ's decision at Step 3 that Dennis' impairments or combination of impairments did not meet a Listing was supported by substantial evidence.

Dennis argues that the ALJ erred because she did not submit interrogatories to Dr. Froman to collect more specific explanation of his opinions. The Court disagrees. The ALJ was not required to recontact Dr. Froman for further explanation because the record contained sufficient information to allow the ALJ to render a decision. See Britt v. Berryhill, 889 F.3d 422, 427 (7th Cir. 2018). There was no error.[4]

---

[4] Dennis also generally criticizes the Social Security administrative fact-finding process. See Dennis Brief, at 10-11. Such complaints should be directed to Congress, not this Court.

Dennis argues that the ALJ also erred by not including within the RFC a limitation that Dennis was moderately limited in maintaining concentration, persistence, and pace.  The Court finds no error.  Drs. Fyans and Mehr both opined that Dennis was moderately limited in maintaining concentration, persistence or pace.  R. 89, 105.  Both also opined that based on Dennis' mental impairments, she could perform simple one and two step tasks throughout a normal workday and a workweek, she could relate and communicate with others and tolerate work pressures, and she could perform one and two step unskilled tasks.  R. 92, 110.   Their opinions provided substantial evidence that Dennis could perform the types of work described in the ALJ's RFC determination even with her moderate limitation in maintaining concentration, persistence, or pace.  See Burmester v. Berryhill, 920 F.3d 507, 511 (7th Cir. 2019) ("[A]n ALJ may reasonably rely upon the opinion of a medical expert who translates these findings into an RFC determination.") (citing Johansen v. Barnhart, 314 F.3d 283, 287-89 (7th Cir. 2002)); Dudley v. Berryhill, 773 F.App'x 838, 843 (7th Cir. 2019) (same); Baldwin v. Berryhill, 746 F. App'x 580, 584 (7th Cir. 2018) (same); see also Jozefyk v. Berryhill, 923 F.3d 492, 497-98 (7th Cir. 2019).

Dennis relies on DeCamp v. Berryhill, 916 F.3d 671, 675-76 (7th Cir. 2019).  In DeCamp, the ALJ did not adequately incorporate all of the mental limitations into the functional limitations in the RFC.  Id.  In formulating the RFC in DeCamp, the ALJ did not track the functional limitations that the medical experts formulated.  Rather, the ALJ created his own limitations of "'unskilled work'" with no "'fast-paced production line or tandem tasks.'"  Id., at 675.  No medical expert in DeCamp said anything about fast-paced production line or tandem tasks work environments.  See Id. at 673-74.  Here, qualified psychologists, Drs. Fyans and Mehr translated Dennis' mental limitations into functional limitations.  The ALJ tracked their opinions of Dennis' functional limitations in her formulation of the RFC.  The Seventh Circuit clearly stated in the subsequent Burmester case that reliance on such qualified opinions was proper and sufficient, "[A]n ALJ may reasonably rely upon the opinion of a medical expert who translates these findings into an RFC determination."  Burmester, 920 F.3d at 511.  There was no error.

Dennis argues that the ALJ erred in relying on Dennis' daily activities as proof that she could work.  The ALJ did not rely on her daily activities to prove that she could work.  The ALJ cited her statements in her Function Report that conflicted with her testimony to assess the weight to give less

weight to her testimony at the hearing because the testimony contradicted those other statements.  R. 22.  The ALJ is instructed to consider evidence of the claimant's daily activities in evaluating her statements about the effects of her symptoms on her ability to work.  See e.g., SSR 16-3p, at *7; see Burmester, 920 F.3d at 510-11.  There was no error.

Lastly, Dennis argues that she was disabled because she had an IQ of 70 and had problems dealing with workplace stress.  The argument is undeveloped and forfeited.  See Jarrard v. CDI Telecommunications, Inc., 408 F.3d 905, 916 (7th Cir. 2005); Martinez v. Colvin, 2014 WL 1305067, at *11 (N.D. Ill. March 28, 2014).

THEREFORE, THIS COURT RECOMMENDS that the Defendant Commissioner's Motion for Summary Affirmance (d/e 15) should be ALLOWED; Plaintiff Kimberlee L Dennis' Brief in Support of Motion for Summary Judgment (d/e 11) should be DENIED, and the decision of the Defendant Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video

Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local

Rule 72.2.

ENTER:   November 23, 2020


_____s/ *Tom Schanzle-Haskins*_____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE